

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS
F. #2018R01559

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 8, 2019

By Hand and ECF

The Honorable Vera N. Scanlon
United States Magistrate Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Luis Rivas, et al.
>        Criminal Court Case No. 19-069 (PC)

Dear Judge Scanlon:

On February 7, 2019, a grand jury in this District returned an indictment charging the defendants, Luis Rivas, also known as "Inquieto" and "Kiko," Dennis Cabrera, also known as "Panda," Javier Rodriguez, also known as "Joker," with assault in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3).  If convicted, the defendants face a statutory maximum sentence of 20 years in prison.  The defendants are scheduled to be arraigned before the Court today.

The government respectfully submits this letter in support of its request for a permanent order of detention for all three defendants, each of whom were incarcerated on state charges, as detailed below, at the time of the instant offense.

I.     Legal Standard

A.     The Bail Reform Act

The Bail Reform Act empowers federal courts to order a defendant's detention pending trial where the government establishes by clear and convincing evidence that the defendant is a danger to the community or, by a preponderance of the evidence, that he represents a risk of flight.  See 18 U.S.C. § 3142(e); Ferranti, 66 F.3d at 542; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The Bail Reform Act lists four factors a court should consider in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir.  2004).

B.    Elaborate Bail Packages Are Insufficient to Protect the Community Against Dangerous Defendants

The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 97, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property). The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals.  In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the

2

wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

## II.    Proffered Facts Regarding the Defendants' Crimes

The government proffers the following facts concerning the charges at issue and pretrial detention.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

The defendants are members of the violent transnational criminal organization La Mara Salvatrucha, also known as "MS-13." MS-13 operates through chapters, or "cliques," throughout the United States, which report and funnel money to a central leadership based in El Salvador.   The enterprise, which is active in Queens and Long Island, engages in a range of racketeering activity, including murder, extortion, assault, robbery, narcotics trafficking and obstruction of justice. Gang membership is considered a lifetime commitment, with only rare exceptions that allow individuals to leave the gang. Clique members often carry out directives from regional, national and international MS-13 leaders, including orders to kill witnesses, rival gang members, and potential cooperating or defecting MS-13 members. MS-13 cliques assist each other in carrying out violent crimes, harboring fugitives, acquiring firearms, distributing narcotics and other criminal activity.

On the evening of October 22, 2018, while inmates at the Manhattan Detention Complex,[1] MS-13 members Luis Rivas, Dennis Cabrera and Javier Rodriguez jointly assaulted

---

[1]        In United States v. Saavedra, the Second Circuit held that a violent crime in-aid-of racketeering is a continuing offense and that acting "'for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity'—is a critical conduct element of the offense." 223 F.3d 85, 90 – 91 (2d Cir. 2000). As such, "venue

a fellow inmate who they suspected was a member of the rival Latin Kings street gang.  The brutal assault was captured on video surveillance footage, which shows the defendants variously punching, kicking and stabbing the victim with a makeshift knife, first in his cell and then in a hallway of the facility.  At the conclusion of the assault, defendant Rivas flashed an MS-13 hand sign at the victim.  Approximately 20 minutes before the assault began, defendant Cabrera engaged in the following recorded jail call with his girlfriend, which has been translated from Spanish to English,[2] in which he discusses the impending attack on the victim:

| | |
|---|---|
| CABRERA: | And now I have another problem. |
| GIRLFRIEND: | What happened? |
| CABRERA: | Nothing, you know, a Latin King came in here, you know and we have let him be but now these guys want to get him and they want to stab him and you know.  So, you tell me.  There's only three of us here right now.  Supposedly, the three of us have to do it, imagine and that would be another case, son of bitch.  All because of the damn gang. |
| GIRLFRIEND: | I didn't understand you, sweetheart. |
| CABRERA: | You didn't hear that there is a Latin King here? |
| GIRLFRIEND: | Mm-hmm. |
| CABRERA: | And, this house is only Trinitarios and Mara, so they want to get him and stab him and you know, imagine.  There's only three of us and all three of us have to go and that would be another case, you know.  If not, the one that would be stabbed would be me.  And all because of the damn gang.  I'm telling you that sometimes I feel like taking my own damn life.  This thing is garbage. |
| GIRLFRIEND: | Don't say that. |

---

in the district where th[e] enterprise is principally based is appropriate."  Here, while the assault occurred in Manhattan, venue is proper in the Eastern District of New York because "the racketeering element of the § 1959 violation serves as a continuing thread" between Queens and Long Island, "the epicenter of [MS-13's] racketeering operations" in New York, and Manhattan, the site of the Assault.  Id. at 92.

[2]     This transcript is a draft translation and transcript that is not final and is subject to correction and revision.

CABRERA:        I'm disappointed, mami, with these damn decisions I have made. You know, but whatever.  That's why I'm telling you that sometimes I feel like, like destiny wants to keep me away from you, you know and with my life all fucked up and in this damn gang.  You know…

                [overlapping]

GIRLFRIEND:     Well, I don't think it's life.  I think it's just bad decisions you make.

CABRERA:        Yeah.  Let's see.

                        *               *               *

GIRLFRIEND:     If only they could have that person removed from there.

CABRERA:        No, imagine, these people have a count.

GIRLFRIEND:     No sweetheart, if they take him out of the house… if they move him from that house.

CABRERA:        Oh, imagine.  Let's see what happens with that.

GIRLFRIEND:     No, well, I hope that… you know… eh, you don't get into more trouble and you don't end up in the box and we lose the chance to get married again, because—because of something happening.

CABRERA:        Yeah.

                        *               *               *

CABRERA:        Don't get mad at me, you know.  Even though I know…

                [overlapping]

GIRLFRIEND:     Ah…

CABRERA:        …that you get mad at me, imagine, for all the stupid shit that I do, but—but imagine, those are the consequences of being in this damn shit.

Medical records and photographs indicate that the victim suffered multiple puncture wounds to his back, torso, and arms, including two deeper lacerations that required stitches.

At trial, the government will establish the defendants' membership in MS-13 through, among other things, witness testimony, photographs of the defendants making hand signs used by the gang, the defendant's tattoos, and other evidence.

The proof in the case includes (1) testimony of eyewitnesses and cooperating witnesses; (2) video surveillance footage that captures the attack; (4) audio recordings and other evidence.

III.   Argument

Here, all four Bail Reform Act factors counsel strongly in favor of detention. First, as set forth above, the nature and circumstances of the crime charged is serious. Unprovoked, the defendants entered the victim's cell and assaulted him with a dangerous weapon, punching, kicking and stabbing him with a makeshift knife and then continuing their assault thereafter in a hallway of the detention facility.  The nature of the offense, and their membership in MS-13, also indicates that the defendants have no qualms about assaulting rivals – even in full view of surveillance cameras and while incarcerated.  Their actions and gang membership clearly show that the defendants present a risk of obstruction of justice and can be expected to attempt to intimidate or harm those believed to be witnesses in the government's case. See 18 U.S.C. § 3142(f)(2); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of the evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

Indeed, at the time of the assault, (1) defendant Luis Rivas was detained on pending state charges, including attempted murder, assault in the first degree (intent to cause serious injury with a weapon), and robbery in the first degree; (2) defendant Dennis Cabrera was detained on pending state charges, including attempted murder, assault in the first degree (intent to cause serious injury with a weapon), robbery in the first degree, and gang assault; and (3) defendant Javier Rodriguez was detained on pending state charges, including attempted murder, assault in the first degree, and attempted robbery in the first degree (use/threatens use of dangerous instrument).

Second, as outlined above, the government's evidence in this case is strong and consists of, among other things, video surveillance footage of the assault, cooperating witness testimony, and audio recordings.

Third, the defendants are members of MS-13, a violent transnational criminal enterprise whose members and associates have previously been convicted in this District of murder, obstruction of justice, assault and a number of other violent crimes.  The defendants' membership in, and association with, the gang is significant not only because it demonstrates their proclivity for violence, but because it provides them with access to a network of MS-13

6

chapters throughout the United States and in El Salvador willing to harbor and assist them should they decide to flee or obstruct justice.

Finally, as noted, the circumstances of the charged crimes and the defendants' membership in MS-13 clearly demonstrate that the defendants would pose a significant danger to the community and the witnesses against them if released.  See 18 U.S.C. § 3142(f)(2); Madoff, 586 F. Supp. 2d at 247.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court enter a permanent orders of detention with respect to the defendants Luis Rivas, Dennis Cabrera, and Javier Rodriguez.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    ____/s/_____
Nadia I. Shihata
Nadia E. Moore
Assistant U.S. Attorneys
(718) 254-7000

cc:    Defense counsel (By Hand)